IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2019

## HUBERT GLENN SEXTON, JR. v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Scott County**
**No. 10272     E. Shayne Sexton, Judge**

_____

**No. E2018-01864-CCA-R3-PC**

_____

The petitioner, Hubert Glenn Sexton, Jr., appeals the denial of his post-conviction petition, in which the petitioner challenged his conviction for two counts of first degree murder, arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial and on appeal. After our review of the record, briefs, and applicable law, we conclude the petitioner was denied his constitutional right to a fair and impartial jury and received the ineffective assistance of counsel. Accordingly, we reverse the judgment of the post-conviction court, vacate the petitioner's convictions, and remand the case to the trial court for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

J. Ross Dyer, J., delivered the opinion of the court, in which Norma McGee Ogle and Robert H. Montgomery, Jr., JJ., joined.

Hubert Glenn Sexton, Jr., Mountain City, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Jared R. Effler, District Attorney General; and David Pollard, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On direct appeal, the Tennessee Supreme Court summarized the facts surrounding the petitioner's convictions, as follows:

On the night of May 20, 2000, a Saturday, Stanley Goodman and his wife, Terry Sue Goodman, were shot to death as they slept in their bed at their residence in Scott County. Their bodies were discovered the next morning by Mr. Goodman's minor daughter, E.G., who resided in their home.[1] The murders took place four days after another of Mr. Goodman's minor daughters, B.G., reported to authorities that she had been sexually abused by her stepfather, [the petitioner]. At the time, the [petitioner] and his wife, Sherry Sexton, lived in Bradley County with the [petitioner's] daughter, B.S., and E.G.'s younger sister, B.G., and brother, Br.G., both of whom were Ms. Sexton's children by her marriage to Mr. Goodman.

Within days of the crimes, the [petitioner] was arrested and charged with two counts of first degree murder. *See* Tenn. Code Ann. § 39-13-202 (1997). On July 18, 2000, the district attorney general filed a notice seeking the death penalty for each of the murders. *See* Tenn. R. Crim. P. 12.3(b). The aggravating circumstance relied upon by the State for each of the two offenses was that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(i)(6) (1997 & Supp. 1999); *see also* Tenn. R. Crim. P. 12.3(b)(2).

**Guilt Phase of the Trial**

Hope Tharp, who served as the Child Protective Services Team Leader for the Department of Children's Services ("DCS") for Bradley County and several of its surrounding counties, first interviewed B.G. and Ms. Sexton in Bradley County on March 17, 2000, at the request of the Scott County DCS, as part of an investigation of possible child sexual abuse by the [petitioner]. The [petitioner] and Ms. Sexton had lived at the Goodman residence before moving to Bradley County. No charges resulted from the complaint.

Two months later, on May 16, 2000, Ms. Tharp received a report from authorities at Black Fox Elementary School in Cleveland that B.G., age 8, had made an allegation of sexual abuse by the [petitioner]. Based upon B.G.'s statement that the sexual abuse had occurred on the previous night, Ms. Tharp immediately notified Ms. Sexton and scheduled a meeting with the Sextons at 4:00 p.m. that afternoon. When the [petitioner] and the Sextons' daughter B.S. failed to arrive at her office at the time of the

---

[1] It is the policy of this Court to refer to minors by initials only.

meeting, Ms. Tharp sought the assistance of the Bradley County Sheriff's Department. After being notified that officers had found the [petitioner] at his residence, Ms. Tharp traveled there to meet with him and to explain the basis for DCS taking custody of the three children in the Sexton household. Three officers were present. The [petitioner], after being warned that he could be arrested for custodial interference, provided information as to B.S.'s whereabouts. Ms. Tharp, who by that time had interviewed the three children living in the Sexton home, all of whose statements were identical, then explained to the [petitioner] that he would have to come to her office for questioning. Over objection by the [petitioner], Ms. Tharp testified that she informed him that B.G. had claimed that she had been required to "close her eyes and open her mouth," to "put her mouth on his penis and suck it," and that "if she told she would never see her dad again." According to Ms. Tharp, the [petitioner], upon hearing the accusation, stood from his chair, denied the truth of the allegations, and responded, "Well, she is getting this information from her sister, [E.G.], and her father." He insisted that B.G. had made up the story and that Mr. Goodman had "put her up to it." He also claimed that Mr. Goodman had telephoned him some three months earlier and played an audiotape recording of Mr. Goodman coaching B.G. to say "things." When Ms. Tharp advised the [petitioner] that his statement was inconsistent with that of B.G. and the other two children and that if he "did these things," he should confess and get treatment, he remarked, "Well, I can go over and sign papers saying I did it and serve two or three years in jail and we can be a family again." Ms. Tharp then explained, "That's not the way it works . . . . [I]f you go over and say you did it, and you go to jail for this . . . , you can't just come out of jail and be a family again."

Bradley County Sheriff's Deputy Jerry Kyle Millsaps, who went to the Sexton residence to assist DCS, overheard the [petitioner] complain to Ms. Sexton about "her family causing them problems" and say, "they think I'm guilty here already." He also overheard the [petitioner] proclaiming his innocence of child sex abuse and stating that he "was not going to jail for . . . a child abuse charge [and that i]f I go to jail for anything, it would be for murder." When questioned by the State at trial, Officer Millsaps also made reference to a possible polygraph examination for the [petitioner], who initially consented to the test. On re-direct examination, and over objection by the [petitioner], the State was permitted to ask, "Are you aware that when Mr. Sexton . . . was later given the opportunity to take the polygraph test, [he] wouldn't?" The officer responded in the negative.

On the same date DCS received the sex abuse complaint, Detective Tony Alvarez of the Bradley County Sheriff's Department became involved in the investigation. After driving to the school and speaking with B.G., Detective Alvarez provided the [petitioner] with *Miranda* warnings and then questioned him. The [petitioner] contended that Mr. Goodman was responsible for the charge made by B.G. and had persuaded "the children to trump up some false allegations." He claimed that Mr. Goodman was motivated by his displeasure with the Sextons' decision to move out of the Goodman home in Scott County to a residence in Bradley County, taking two of the three Goodman children with them.

Later in the week, Mr. Goodman, having been apprised of the investigation, contacted Detective Alvarez, informing him that he intended to file a petition in Bradley County on the following Monday seeking custody of the children. Afterward, the detective informed the [petitioner] of Mr. Goodman's plan. When, during this conversation, Detective Alvarez asked the [petitioner] about taking a polygraph examination regarding the sex abuse allegation, the [petitioner] declined, explaining that Special Agent Skip Elrod had informed him that polygraphs could be "fixed."

In the week before the murders, the [petitioner] informed Preston Adams, a co-worker, of the child abuse charge, told him that Mr. Goodman was responsible, and asked where he might acquire a .22 or .25 caliber handgun so that he could "try to take care of the matter before it could escalate." On Saturday, May 20, the [petitioner] worked in construction with Adams from 8:00 a.m. to 12:30 p.m. During that time, he told Adams he had not "had any sexual contact with the children." As the two men left the job site, the [petitioner] informed Adams that he "was not going to let [Mr. Goodman] come down [to Bradley County] before he took care of that."

At approximately 6:00 p.m., the [petitioner] drove to the Maxi Muffler shop where he visited with Clinton Daniel Mason, whom he had known for three or four years and saw as often as two or three times a week. While there, the [petitioner] asked Mason to return his .22 caliber rifle, which had been stored at Mason's residence, explaining that he had to "take care of some business in Scott County." Mason traveled to his mother's residence, where he obtained the weapon for the [petitioner].

- 4 -

Vella Strunk, the sister of Stanley Goodman, lived in Scott County near the Goodman home. On Saturday nights, Ms. Strunk and her family regularly attended the races in Scott County and were typically joined by E.G. Because races usually lasted into the early morning hours, E.G. most often returned to her family residence at 2:00 or 2:30 a.m. According to Ms. Strunk, the [petitioner] knew that E.G. routinely attended the races and that the Goodmans would leave their door unlocked for her. On the night of May 20, E.G. joined the Strunk family for an evening at the racetrack. Because of rainy weather, however, they returned to the Strunk residence. At 8:30 p.m., Ms. Strunk called Mr. Goodman to let him know that E.G. planned to stay for a while. Although E.G. recalled being returned to the Goodman residence as early as 9:30 or 10:00 p.m., Ms. Strunk estimated the time to be 11:00 p.m. She testified that no lights were on at that time. Because Ms. Strunk had asked to borrow a bag of coffee, she did not leave until E.G. returned with the coffee. E.G. did not see the Goodmans before going to bed. Shortly before noon on the following day, Ms. Strunk called the Goodman residence but got no answer. About ten minutes later, E.G. telephoned Ms. Strunk, tearfully informing her that her father and stepmother were still in bed and had blood on them. Ms. Strunk drove to the residence, discovered the bodies of Mr. and Ms. Goodman, and contacted the police.

At approximately 3:30 a.m. on Sunday, May 21, several hours before the bodies were discovered, Mason drove to the [petitioner's] residence. At trial, Mason recalled that Ms. Sexton appeared to be upset and that the [petitioner] appeared to be "drunk or something." At 8:30 on the same morning, the [petitioner] drove to Mason's residence and took Mason and his girlfriend to a Denny's Restaurant for breakfast. When the [petitioner] admitted to Mason that he had killed Mr. Goodman, Mason stopped him from providing any of the details. The [petitioner] later acquired two tires for his 1989 Oldsmobile at Mason's place of employment.

Between 8:00 and 9:00 a.m. on Monday, May 22, the [petitioner] and Ms. Sexton visited Adams and his girlfriend at their room at a Budget Inn. While Ms. Sexton talked with Adams's girlfriend, the [petitioner] admitted to Adams that he killed the Goodmans as they slept in their bedroom, explaining that he had bought a hood, sweats, and gloves at a Dollar Store and, after "dispos[ing] of all hair follicles off of his body," had shot the Goodmans in the bedroom, burned his own clothes and the stock of his rifle, and buried what remained of the rifle. The [petitioner] informed

Adams that he had purchased oversized shoes so that it would appear that someone else had committed the crimes. He also informed him that he had changed the tires on his vehicle.

On Sunday, May 21, shortly after the discovery of the bodies of the Goodmans, Detective Alvarez received a telephone call informing him of the crimes and of the involvement of the Tennessee Bureau of Investigation ("TBI"). Later in the day, he spoke with the Sextons. Three days later, on May 24, Detective Alvarez learned that Sherry Sexton had tried to reach him by telephone. He recorded his return calls to Ms. Sexton, whom he described as sounding desperate, and arranged a meeting with her at the south precinct. At 11:00 p.m. on the same night, Detective Alvarez and TBI Special Agent Barry Brakebill met with Ms. Sexton, who was apparently prepared to make a statement. About thirty minutes later, the [petitioner] arrived, insisting that he be allowed to talk with Ms. Sexton and attempting to force his way into the interview room. Detective Alvarez left the room to confront the [petitioner], who claimed that Ms. Sexton was upset and did not know what she was talking about. In the meantime, Agent Brakebill moved Ms. Sexton to another location in order to complete the interview and, afterward, transported her to a safehouse in McMinn County. The [petitioner] was arrested for the murders on the following day.

TBI Agent Charles Scott, who searched the [petitioner's] residence after obtaining consent, found a .22 caliber rifle, which was inoperable because there was no trigger assembly. Although not the weapon the [petitioner] acquired from Mason or submitted as the weapon used in the murders, the trial court admitted the rifle as an exhibit. Agent Scott also testified that it would take between two and two and one-half hours to travel the 125 miles from Huntsville in Scott County to Bradley County by interstate. He stated that an alternate route through Harriman could involve even less travel time.

During the course of the murder investigations, it was determined that Christy Swallows, who resided in the same trailer park as the Sextons and had babysat for the children living in their home, had been involved in an affair with the [petitioner]. At trial, she stated that the [petitioner] had informed her about the child sex abuse allegations on or about May 14, and that he blamed "[t]hat bastard in Scott County" for his predicament, declaring that "he would kill him for this." On the day after the murders, the [petitioner] came to her residence and beat on her doors and windows to awaken her. She described the [petitioner] as "frantic" and "in a panic."

He informed her that his wife had left him and her car was at the police station. When Ms. Swallows asked the [petitioner] whether he had committed the crimes, he initially said "no," but ultimately admitted to committing both murders, "blow[ing] them son of a bitches full of holes." He explained that he had acquired the gun from "Danny." Ms. Swallows reported this information to Agents Brakebill and Scott on May 25.

During trial, the transcribed preliminary hearing testimony of Tinnie Chumley[2], an employee at the Dollar Store in Cleveland, was presented as evidence. She reported that on Saturday, May 20, she sold a black sweatshirt and black sweat pants to a white male. Ms. Chumley was unable to identify the [petitioner] from a photographic lineup. TBI Agent David Guy, who interviewed Ms. Chumley, presented a cash register journal that established 2:37 p.m. as the time of a purchase in the amount of $10.83 for a fleece shirt and pants. Payment was with a twenty dollar bill. On May 21, the same day the bodies were discovered, officers found a Dollar Store receipt for a fleece shirt and pants in the same amount in the [petitioner's] car. The receipt confirmed that the purchase was made in cash.

Shera Crowley, who had prepared the [petitioner's] tax return early in 2000, testified that when she pointed out that he had omitted his own daughter, B.S., as a dependent, but added E.G., the daughter living with the Goodmans, the [petitioner] remarked, "If the son of a bitch ever tried to claim her or take her, he would blow his . . . brains out." Ms. Crowley testified that she later warned Ms. Goodman of the threat, but that Ms. Goodman did not appear to be concerned.

Detective Wade Chambers of the Scott County Sheriff's Department investigated the crime scene. He found no weapons, fingerprints, tire prints, or signs of forced entry at the Goodman residence. Initially, he discovered six shell casings in the residence. Later, after receiving the autopsy report, he returned to the scene and discovered three more shell casings, explaining that the casings were difficult to find during his first visit because of sawdust on the floor. Dinah Culag, a TBI Forensic Scientist, determined that all the shell casings had been fired from the same firearm. Although she could not identify the type of weapon, it was her opinion that a semi-automatic was used, rather than a revolver, because a cartridge from a revolver had to be manually ejected.

---

[2] Ms. Chumley is also referred to as Tinnie Crumley and Tiny Crumley throughout the record.

Dr. Sandra Elkins, the Knox County Medical Examiner, performed the autopsies at the University of Tennessee Medical Center. She determined that Mr. Goodman had been shot four times, "all in the right facial region." One of the four shots "totally destroyed the right eye" and another severed his spinal cord. A fifth shot wounded his right arm. Dr. Elkins concluded that Ms. Goodman also died from multiple gunshot wounds, three to her face and one in front of her right ear, causing "massive skull fractures and extensive damage to the brain." The seven fragments taken from the two bodies were consistent with a .22 bullet. Because one of the shots passed through Mr. Goodman's body and another passed through that of Ms. Goodman, Dr. Elkins was unable to examine those bullets.

Randall Boston, a law student working for defense counsel, was the only witness appearing on behalf of the [petitioner]. He testified that he had traveled by interstate from the muffler shop in Cleveland to Athens and by State Routes 58, 70, 29, and 27 to the Goodman residence in Huntsville, a distance of 126.8 miles, and that the travel time was two and one-half hours driving at or less than the speed limit. On cross-examination by the State, which attempted to establish that the distance could be driven in less time, Boston answered "no" when asked whether he was aware that the [petitioner] had been charged with driving ninety-seven miles per hour along the same route two days after the murders.

After a short period of deliberation, the jury returned verdicts of guilt on each of the two counts of first degree murder.

**Penalty Phase of the Trial**

During the penalty phase of the trial, the State offered victim impact evidence from Lamance Bryant -- the brother of Ms. Goodman and a school teacher in Scott County -- E.G., and Ms. Strunk, the sister of Mr. Goodman. Bryant, who described Ms. Goodman as "a very friendly, outgoing person," with "a sweet spirit," testified that she was also survived by her mother, Magdalene Lawson, and two sisters, Sharon Jeffers and Jaretta Claxton. He recalled that Ms. Goodman had been seriously injured in a 1985 automobile accident, which had resulted in a complete inability to work. He stated that she had endured several months of physical therapy and years in a wheelchair and later had to use a walker. He state[d] that she had to re-learn to talk as a result of the accident and had been able to walk

on her own for a period of only six to eight months prior to her murder. Bryant described her death as particularly devastating to their mother.

E.G., who testified that she was particularly close to her father, stated that she had a good relationship with her step-mother, Ms. Goodman. Since the murders, she had experienced nightmares, feared being alone, and partially blamed herself because the door at her residence had been left open for her return from the races. When asked where her home was at the time of the trial, she answered, "I really don't feel like I have one."

Ms. Strunk confirmed that E.G. had experienced nightmares, did not sleep well, and was afraid to be by herself. Because of Ms. Strunk's close relationship with her brother, she believed that her own life would "never be like it was before."

In an effort to establish mitigating circumstances as to punishment, the [petitioner] called three witnesses: Lynn Sexton, the wife of the [petitioner's] first cousin; Karen Cooper, who had known the [petitioner] since he was three or four years old; and Dr. William D. Kenner, a physician with specialized training in psychiatry, child psychiatry, and psychoanalysis.

Lynn Sexton, who is also a first cousin to Sherry Sexton, testified that the [petitioner], Ms. Sexton, and their three children lived with her for approximately six months before they moved first to a trailer park in Scott County and later to a trailer park in Bradley County. Lynn Sexton recalled that during the six months that the [petitioner] lived at her home, he did not cause any difficulty with any member of her family, including her thirteen-year-old son and sixteen-year-old daughter. She stated that the [petitioner] worked everyday, did not drink to excess, and did not use illegal drugs. She testified that she often left her daughter and son in the care of the [petitioner] at her residence.

Karen Cooper remembered that the [petitioner's] parents were divorced when he was six and, thereafter, that he did not live with either parent. Recalling that he had once stepped off of a school bus only to find that his residential family had moved, she estimated that the [petitioner] had lived with between six and eight families before age eighteen and that no one other than her sister-in-law kept him for more than just a few months. Ms. Cooper stated that the [petitioner's] mother rarely communicated with

- 9 -

him and that his father, who was in poor health and living in Dalton, Georgia, only saw him slightly more than his mother.

Dr. Kenner, formerly a member of the faculty in adult psychiatry at Vanderbilt University and in private practice since the mid-1970's, examined the [petitioner] in preparation for the trial. During the course of his examination, he learned that the [petitioner] had lived in twenty-six different residences before he reached the age of eighteen and that he was of average intelligence, but that he did not stay long enough in any place to develop friendships or role models, such as older relatives, teachers, or ministers. Dr. Kenner reported that the [petitioner's] father had spent six months in an Army psychiatric hospital and later developed heart disease and chronic lung disease, which prevented him from keeping his family together after the [petitioner's] mother left his father for another man and took the [petitioner's] younger brother with her. Dr. Kenner described the [petitioner] as traumatized by the loss and as having suffered from significant emotional deprivation during his youth because of the lack of a consistent caretaker. Dr. Kenner explained that the [petitioner] felt particularly vulnerable after the sex abuse allegations because of his fear of losing the children in his residence, particularly his daughter B.S. It was Dr. Kenner's view that the [petitioner] had the capacity to "actually do better in prison . . . because one of the things that prison provides is, it's like family . . . contained . . . consistent." He further testified that if the [petitioner] "lives and spends the rest of his life in prison, then at least his children will not feel as though they are responsible for his execution." On cross-examination by the State, Dr. Kenner acknowledged that the [petitioner] was not insane, in that he knew of his wrongful acts, but he described the [petitioner] as having a personality disorder, which qualified as a mental disease or defect.

After the final argument by counsel and the instructions by the trial court, the jury imposed the death penalty for each of the two first degree murder convictions. The jury concluded that the State had established beyond a reasonable doubt that each of the murders "was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another," the applicable statutory aggravating circumstance. Tenn. Code Ann. § 39-13-204(i)(6).

*State v. Sexton*, 368 S.W.3d 371, 377-84 (Tenn. 2012).

On direct appeal, the Tennessee Supreme Court affirmed the petitioner's convictions but vacated the death penalty, finding (1) the trial court improperly excluded prospective jurors based solely on their jury questionnaires, (2) the trial court erred in allowing a DCS worker to testify as to child sexual abuse allegations against the petitioner, (3) the trial court erred in allowing a police officer to testify regarding the petitioner's refusal to take a polygraph examination, and (4) the trial court erred in allowing the prosecutor to refer to the marital confidential communication privilege during opening arguments. *Id.* at 431. Prior to the petitioner's re-sentencing hearing, the State withdrew its intent to seek the death penalty, and the petitioner was sentenced to consecutive life sentences.

Following the re-sentencing hearing, the petitioner filed a timely pro se petition for post-conviction relief and two amended petitions. During the next four years, five attorneys withdrew from representing the petitioner on his post-conviction claims. Following the withdrawal of the petitioner's fifth appointed attorney, the petitioner waived his right to counsel and filed a third amended petition for post-conviction relief, arguing, in part, Jurors Jeanne Jo Jeffers and Angela Lawson Bunch misrepresented their histories of domestic violence; an unidentified juror told other jurors the petitioner was guilty prior to deliberations; Juror Roger Davis was threatened in the courthouse during trial; a bailiff told Jurors Jeffers and Bunch that a juror had been threatened; the State maliciously presented their case; and the trial court failed to ensure the peremptory challenges and the jury questionnaires were part of the technical record on direct appeal. The petitioner also argued trial counsel was ineffective for failing to investigate a probate issue involving the victims; investigate a cigarette butt and light fixtures collected from the crime scene; properly voir dire prospective jurors regarding pretrial publicity; ensure the peremptory challenges were part of the technical record; investigate the illegal search of the petitioner's vehicle; prepare for the "404(b) hearing;" properly cross-examine Preston Adams; object to the pathologist's testimony regarding the caliber of bullet used during the murders; inquire into the jury's relocation; provide competent advice regarding a stipulation entered at trial; and for abandoning the petitioner during trial. He also argued appellate counsel was ineffective for failing to ensure the peremptory challenges were part of the technical record; failing to raise the issues of jury tampering and extraneous prejudicial information; and failing to object to the State's improper argument during the re-sentencing hearing.

At the March 13-14, 2017 post-conviction hearing, Jeanne Jo Jeffers[3] testified she was a member of the jury during the petitioner's trial. Prior to jury selection, Juror Jeffers indicated on the jury questionnaire that she had read articles about the murders in

---

[3] Juror Jeffers is also referred to as Jennie Jeffers throughout the record.

- 11 -

the local newspaper. However, Juror Jeffers agreed trial counsel did not inquire into the extent of her knowledge during individual voir dire.

Juror Jeffers did not recall whether the jury questionnaire asked if she had been the victim of a crime, and she was not asked this question during voir dire. However, she acknowledged she was the victim of domestic violence at the hands of her ex-husband and "wondered if they would have picked [her] if they knew." She testified she "made an honest mistake" in answering that she had not been the victim of a crime and reasoned that she either did not "see[] that question" or "flew through [the questionnaire]." Juror Jeffers also admitted to discussing her prior experiences with domestic violence during jury deliberations, telling her fellow jurors that she had been the victim of abuse and "knew what a woman [would] do" in that situation. She told the jury that "[y]ou can even spot a woman that's been abused" because "[t]hey are different because of it."

On cross-examination, Juror Jeffers testified she answered all questions during voir dire honestly and told the trial court she could be fair and impartial. She also agreed her past experiences with domestic violence did not influence her verdict of guilty.

Regarding the jury's relocation from one hotel to another during trial, Juror Jeffers testified Bailiff Phyllis Griffith informed her the jury was being moved for security reasons because "one of the jurors had been threatened," and they wanted the jury to stay at a more secure hotel. Juror Jeffers also testified an unidentified juror stated the petitioner was guilty prior to hearing any of the evidence. However, Juror Jeffers "didn't pay any attention to him."

Roger Davis, a juror during the petitioner's trial, testified the jury was leaving the courthouse following the first day of testimony when a man approached him in the hallway and stated, "I know where you live." Although Juror Davis did not know the man, he assumed it was a member of the petitioner's family. Juror Davis informed Sheriff Jim Carson of the threat but did not tell the other jurors. That evening, the jury was moved to a new hotel. However, Juror Davis did not believe the relocation was related to the threat. On cross-examination, Juror Davis testified the threat did not influence his deliberations.

Angela Lawson Bunch, a juror during the petitioner's trial, testified she could not recall her answer to the question in the jury questionnaire asking if she had ever been the victim of a crime but stated she "would probably say no." Juror Bunch did not "consider what happened to [her] a crime" because no one was arrested. However, she admitted she was the victim of domestic violence and was in "a verbally abusive relationship." Although she described the abuse as verbal, Juror Bunch testified "it could have gotten much worse, so yes, domestic violence does stay with me to some extent." On cross-

- 12 -

examination, Juror Bunch agreed the petitioner was found guilty based on the evidence presented at trial and not her past experiences.

Juror Bunch also testified the jurors were given several reasons for the relocation during trial, including "threats" and "security reasons." She recalled Bailiff Griffith telling her the relocation was needed because one of the petitioner's attorneys was staying at the same hotel.

N. S.[4] testified she was a juror during the petitioner's trial. When asked in the jury questionnaire whether she had been the victim of a crime, N. S. answered she and her sister were raped as children by their step-father and she had been the victim of domestic violence. However, N. S. agreed none of the attorneys questioned her about her response to this question during voir dire.

Sherry Farmer, the petitioner's ex-wife, testified she could not recall TBI Agents searching her home following the petitioner's arrest or whether she consented to a search.

Co-counsel testified he was appointed to represent the petitioner prior to the petitioner's preliminary hearing in June 2000.[5] Lead counsel, who was appointed after the petitioner's case was transferred to criminal court, "took the lead" while co-counsel felt his role was "to assist [lead counsel] and work with [the petitioner]."

Co-counsel testified he and lead counsel reviewed the jury questionnaires prior to individual voir dire and used the questionnaires to determine which questions to ask the prospective jurors. Co-counsel was unsure why only one prospective juror was asked about the exposure to pretrial publicity. However, if prospective jurors indicated the media coverage would not have an impact on their judgment, co-counsel did not believe it was necessary to ask the prospective jurors what pretrial publicity they had seen or read. In addition, co-counsel could not recall Nancy Smith's answer on the jury questionnaire. He stated trial counsel may not have asked her about being the victim of child rape if "there were other things in her questionnaire that made us think that we didn't need to ask her that question." Because he did not have N. S. questionnaire in front of him, co-counsel was unable to specify what those reasons might have been. On cross-examination, co-counsel agreed N. S. may have been chosen for the petitioner's jury because she knew co-counsel's mother.

---

[4] It is the policy of this Court to refer to victims of sexual abuse by their initials only. No disrespect is intended.

[5] The petitioner was represented at trial by two attorneys. For clarity, we will refer to them individually as "lead counsel" or "co-counsel" and collectively as "trial counsel."

Regarding the jury's relocation during trial, co-counsel recalled the jury was relocated because lead counsel was staying at the same hotel. He did not believe trial counsel should have questioned the jury about their relocation because the jurors were already questioned by the trial court and gave "satisfactory answers about what had happened." In addition, co-counsel was not aware of any threats made to individual jurors, but he would have "explored" the issue if he had any reason to think a juror had been threatened.

Co-counsel testified he and lead counsel worked together to prepare for the 404(b) hearing regarding the child sex abuse allegations. Co-counsel did not remember interviewing any witnesses for the hearing. Instead, they planned to argue the merits of why the allegations should not be admitted. Specifically, trial counsel argued the allegations were "grossly prejudicial," and any probative value was outweighed by their prejudicial effect.

Regarding trial strategy, co-counsel testified the defense's strategy was to "attack the validity of the evidence." Specifically, trial counsel wanted to attack how the physical evidence was recovered by law enforcement and any discrepancies in the witnesses' statements. To combat the motive being offered by the State, trial counsel discovered a possible probate issue involving the victims and other family members. Although co-counsel could not recall the specifics of the probate issue or how it was developed, he believed he investigated it prior to trial.

Co-counsel agreed "it could be argued" the search of the petitioner's vehicle without consent was illegal, and he did not know why it was not addressed at trial. Additionally, co-counsel did not recall the stipulation entered at trial of the Dollar Store employee's testimony, which was used to link the receipt found in the petitioner's vehicle to items purchased on the day of the murders. However, if the agreed stipulation did not match what was entered at trial, co-counsel would have objected.

On cross-examination, co-counsel acknowledged, at a potential suppression hearing, either the petitioner or his ex-wife, Ms. Farmer, would have had to testify they did not give consent to search the petitioner's vehicle, and the petitioner was "not enthusiastic" about testifying. Although the testimony of Tinnie Chumley, the Dollar Store employee, was introduced through a stipulation because she had health problems, co-counsel acknowledged the stipulation also prevented a courtroom identification of the petitioner. "[I]t was a way for us to control exactly what her testimony would be."

Co-counsel agreed Dr. Sandra Elkins, the forensic pathologist who performed autopsies on the victims, was not qualified as a ballistics expert at trial. However, co-counsel did not believe her testimony stating the bullet fragments found in the victims

"were consistent with a .22 bullet" warranted an objection because "[s]he is probably qualified to testify" to those findings. On cross-examination, co-counsel further explained he did not object to Dr. Elkins' testimony because it was "within her area of expertise based on what [co-counsel] knew and understood it to be."

Co-counsel vaguely remembered the testimony of Mr. Adams. Co-counsel remembered him as "a person who could [not] be believed" but did not recall any specific information the defense had to impeach him. He also could not recall lead counsel's misplacing a file containing impeachment information during Mr. Adams' cross-examination.

Regarding the untested cigarette butts and light fixtures, co-counsel agreed the evidence could potentially be exculpatory if the items did not contain the petitioner's fingerprints or DNA. Additionally, because the petitioner denied being in the victims' home on the night of the murders, co-counsel testified there was no strategic reason for not testing the evidence. However, co-counsel later testified, if testing showed the petitioner's fingerprints or DNA on the items, trial counsel would be forced to disclose that information to the State.

Ronnie Gunter, a bailiff during the petitioner's trial, testified he could not recall specifically why the jury had to be relocated, but he believed someone was uncomfortable at the hotel where the jury was originally housed. He also did not recall being informed of a threat to Juror Davis during the trial.

Lead counsel testified he tried four capital cases, including the petitioner's, during his legal career. Lead counsel's trial strategy was to prove that it was impossible for the petitioner to have travelled from Bradley County to Scott County on the night of the murders. However, lead counsel acknowledged he used the petitioner's time frame and not the one established at trial by the State.

Lead counsel agreed the jury questionnaires were tools used to assist in selecting the jury. He also agreed there was no reason why N. S. should not have been excused after she disclosed on her questionnaire that she had been raped as a child by her step-father, and prospective jurors should have been asked about the extent of their exposure to pretrial publicity. On cross-examination, lead counsel acknowledged N. S.'s experience as a victim of a crime was a "factor" to consider but was not the "whole picture." He also agreed it was possible that bringing up the details of the crime to the prospective jurors could have a prejudicial effect.

Regarding the relocation of the jury, lead counsel testified he was told someone on the jury was uncomfortable staying at the same hotel as lead counsel. Although lead

counsel was not made aware of any threats to the jury, he agreed polling the jury could have brought that issue to the court's attention. On cross-examination, lead counsel testified he would have brought a jury threat to the trial court's attention if he were made aware of it.

Lead counsel was unable to recall the details of the probate issue involving the victims or who may have investigated that issue. Lead counsel also could not recall the cigarette butts and light fixtures collected from the victims' home. However, he agreed that if they had that evidence, it should have been tested for fingerprints and DNA. When asked about the 404(b) hearing, lead counsel was unable to recall the motion or the child sex abuse allegations against the petitioner. Lead counsel also could not recall Preston Adams' testimony or whether lead counsel left the courtroom during the testimony of Agent Guy.

Regarding the search of the petitioner's vehicle and the Dollar Store receipt, lead counsel did not recall the petitioner telling him the police did not have consent to search his vehicle. However, he agreed they should have challenged the search as a Fourth Amendment violation. Lead counsel also did not recall the stipulation that was entered into evidence at trial concerning the Dollar Store receipt. On cross-examination, lead counsel agreed it would be impossible to exclude the receipt if neither the petitioner nor his wife were willing to testify they did not consent to the search.

Lead counsel agreed Dr. Elkins was not qualified as an expert in ballistics. He also agreed forensic pathologists can make mistakes when calculating a bullet's size from smaller fragments and did not know why he did not object to her testimony.

Appellate counsel testified he represented the petitioner at the motion for new trial hearing and on direct appeal, exclusively handling the jury issues on direct appeal. Appellate counsel recalled telling the trial court during the motion for new trial hearing that the jury questionnaires were pertinent to the petitioner's issues, and he asked the trial court to make the questionnaires part of the record. Although appellate counsel did not recall telling the trial court he would make copies of the questionnaires and submit them to the court, appellate counsel testified he did submit the questionnaires to the trial court "to the best of [his] recollection." Additionally, when the Tennessee Supreme Court ordered appellate counsel to supplement the record with the missing questionnaires, appellate counsel "assum[ed]" he complied with their order. On cross-examination, appellate counsel agreed the burden is on the petitioner, not the State, to ensure the appellate record is complete.

Appellate counsel agreed the petitioner would need to exhaust all of his peremptory challenges to preserve a jury issue on direct appeal. In preparing the

appellate brief, appellate counsel was unable to determine who made which peremptory challenge based on the record. Appellate counsel agreed it "was a problem," and he was unable to "c[o]me up with a solution."

Regarding the issues raised on direct appeal, appellate counsel testified he and the petitioner disagreed as to which issues should be raised on direct appeal and which issues would be more appropriate for a collateral proceeding. Although the petitioner wanted to raise the issue of the threatened juror on direct appeal, appellate counsel, after consulting other attorneys and based on his experience and training, chose not to raise the issue because "issues outside of the record should be preserved for raising them on a collateral post-conviction proceeding."

During the re-sentencing hearing, appellate counsel recalled the State arguing the child sex abuse allegations were an aggravating factor in determining whether the petitioner's sentences should run consecutively. Although he agreed an objection should have been made, appellate counsel did not object to this argument. On cross-examination, appellate counsel agreed the State's mention of the child sex abuse allegations was not the sole reason for the petitioner's consecutive sentences.

Re-sentencing counsel testified he reviewed the Tennessee Supreme Court's decision prior to the petitioner's re-sentencing hearing. However, he did not agree an objection was needed to the State's argument was that the sexual abuse allegations were an aggravating factor. Instead, because the trial court was determining whether the petitioner's sentences were consecutive or concurrent, re-sentencing counsel believed the trial court was "in the best position to decide whether or not [the child sex abuse allegations were] a factor that the [trial court] should consider or not consider." Although re-sentencing counsel did not believe it was a "conscientious strategic decision" not to object, he testified it is his practice to object only when necessary.

After its review of the evidence presented, the post-conviction court denied relief in an oral ruling on April 2, 2018. The petitioner filed a notice of appeal on April 9, 2018, and the post-conviction court entered its written order denying relief on May 4, 2018. On October 19, 2018, this Court granted the petitioner's motion to late-file his notice of appeal.

*Analysis*

On appeal, the petitioner asserts (1) the State committed a *Brady* violation by losing or destroying four jury questionnaires; (2) Juror Jeffers failed to disclose her history of domestic violence and discussed her experiences during deliberations; (3) Juror Bunch failed to disclose her history of domestic violence; (4) an unidentified juror

discussed the petitioner's case prior to the start of deliberations; (5) Juror Davis was threatened by an unknown person during trial; (6) Jurors Jeffers and Bunch received extraneous information from a bailiff regarding the threat to Juror Davis; (7) trial counsel was ineffective during the guilt and penalty phases of the trial; (8) appellate counsel was ineffective during the direct appeal and re-sentencing hearing; (9) re-sentencing counsel was ineffective during the re-sentencing hearing; (10) the prosecution engaged in misconduct by fabricating overly prejudicial evidence; (11) the State failed to inform the defense of the threat to Juror Davis; (12) the trial court erred in violating Tenn. R. Crim. P. 24(d)(5); (13) the trial court failed to properly rule on the issues presented at the post-conviction hearing; and (14) cumulative error warrants a new trial.

## I.      Post-Conviction Court's Findings

We must first address the petitioner's assertion that the post-conviction court failed to make specific findings of fact regarding several issues addressed at the post-conviction hearing.   Tennessee Code Annotated section 40-30-111(b) provides as follows:

> (b) Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each such ground.

Although this requirement is mandatory, "the failure of the trial judge to abide by the requirement does not always mandate a reversal of the trial court's judgment." *State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984) (citing *Brown v. State*, 445 S.W.2d 669 (Tenn. Crim. App. 1969)).   The purpose of the statute is to facilitate appellate review of the post-conviction court's decision.   Therefore, a remand is not required when the record is otherwise adequate for review, even if the trial court failed to comply with the rule. *Id.*

In this case, the post-conviction court made an oral ruling denying the petition for post-conviction relief, which was later reduced to a written order.   However, the post-conviction court failed to make specific findings of fact regarding several of the petitioner's jury issues and claims of ineffective assistance of counsel.  The record before this Court contains the transcripts of the evidentiary hearing, the complete record of the petitioner's trial, and the post-conviction court's findings.   Therefore, we conclude the record is adequate for our review of the substantive issues.

## II.    *Brady* Violation

The petitioner contends the State committed a *Brady* violation by losing or destroying several jury questionnaires.  Prior to the post-conviction hearing, the petitioner requested the jury questionnaires for Jurors Jeffers, Bunch, Davis, and Smith.  However, the State and the court clerk were unable to locate the requested questionnaires.  The State contends the petitioner has failed to show any exculpatory evidence was lost or destroyed.

Suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial.  *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. Crim. App. 2012).  In order to establish a violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material.  *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014).  Evidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed.  *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000).

In addition, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'"  *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).  However, the prosecution is not required to disclose information that the defendant either possesses or is able to obtain.  *Johnson*, 38 S.W.3d at 56.

Here, the petitioner has failed to establish the State committed a *Brady* violation. The jury questionnaires do not constitute *Brady* material as they can never exculpate a defendant.  Per *Brady*, the State has a duty to turn over "evidence favorable to an accused . . . where the evidence is material either to guilt or punishment . . . ."  *Brady*, 373 U.S. at 87.  Evidence is favorable to an accused where it exculpates the accused, mitigates the punishment, or impeaches the prosecution's witnesses.  *See Johnson v. State,* 38 S.W.3d 52, 55-56 (Tenn. 2001).  While knowing if a certain juror might have preconceived ideas about a case could be helpful to a defendant in selecting jurors, such does not constitute exculpatory or mitigating evidence as it does not relate to guilt or punishment.  Thus, it does not amount to *Brady* material.  Accordingly, the petitioner is not entitled to relief.

## III. Juror Bias

Every criminal defendant enjoys the right to a trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (citing *Caldararo ex rel. Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 743 (Tenn. Ct. App. 1990)). Challenges to juror qualifications can be (1) *propter defectum*, "on account of defect," or (2) *propter affectum*, "on account of prejudice." *See State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). *Propter defectum* disqualifications include those based on alienage, family relations, or other statutory mandate and must be challenged before the return of a jury verdict. *Id.* *Propter affectum* disqualifications are based upon bias, prejudice, or impartiality and may be made after the jury verdict. *Id.* Therefore, a claim of juror bias or impartiality may be asserted in a petition of post-conviction relief. *See Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *76 (Tenn. Crim. App. Aug. 29, 2014), *no perm. app. filed*.

The Tennessee Constitution guarantees every defendant "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" *Akins*, 867 S.W.2d at 354 (quoting *Toombs v. State*, 270 S.W.2d 649, 650 (Tenn. 1954)). "Jurors who have prejudged certain issues or who have had life experiences or associations which have swayed them in response to those natural and human instincts common to mankind interfere with the underpinnings of our justice system." *Id.* During voir dire, jurors are obligated to make "full and truthful answers . . . neither falsely stating any fact nor concealing any material matter." *Id.*

To prevail on a claim of juror bias, the defendant must establish a prima facie case of bias or partiality. *Id.* "When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises." *Id.* Additionally, "failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality." *Id.* at 356. The intent of the juror is not dispositive of the issue of bias. *Id.* at n. 15.

There is a presumption of bias "when a juror's response to relevant, direct voir dire questioning, whether put to that juror in particular or to the venire in general, does not fully and fairly inform counsel of the matters which reflect on a potential juror's possible bias." *Id.* at 357. However, the presumption may be rebutted by the absence of "actual prejudice," with the court viewing the totality of the circumstances, and not only "the juror's self[-]serving claim of lack of partiality." *Id.* Actual prejudice is established when the presumed bias is confirmed by the juror's conduct during jury deliberations

giving rise to the possibility that improper extraneous information was provided to the jury. *Id.* "Although jurors may be asked about extraneous information imparted, the may not be asked about the effect of that information on the juror's mental process or the jury's deliberations." *Carruthers v. State*, 145 S.W. 3d 85, 95 (Tenn. Crim. App. 2003) (internal quotation marks and citations omitted); *see* Tenn. R. Evid. 606(b).

## A.     Juror Jeffers

The petitioner argues that Juror Jeffers failed to disclose her relevant past history of domestic violence and that her presence on the jury violated his right to a fair and impartial jury. The State contends the petitioner failed to establish a prima facie case of bias.

At the post-conviction hearing, Juror Jeffers did not recall a question on her jury questionnaire asking whether she had been the victim of a crime. However, she later testified she made "an honest mistake" and either did not "see[] that question" or "flew through it." She also testified she was not asked during her individual voir dire whether she had been the victim of a crime, which "surprised" her, and she acknowledged she was the victim of domestic violence by her ex-husband. She also "wondered if [the attorneys] would have picked [her] if they knew."

Juror Jeffers admitted to discussing her past experiences with domestic violence with other jurors. She told other jurors she was the victim of domestic violence and "knew what a woman [would] do" in that situation, referring to the petitioner's wife. She also told the jury "[y]ou can even spot a woman that's been abused" because "[t]hey are different because of it."

The Tennessee Supreme Court recognized that "potential bias arises if a juror has been involved in a crime or incident similar to the one on trial." *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011). Similarly, this Court has previously determined the failure of a prospective juror to disclose she was a victim of domestic violence in a capital murder trial involving domestic violence "is not insignificant." *Robert Faulkner*, 2014 WL 4267460 at *78. In *Smith*, our supreme court held "the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." *Smith*, 357 S.W.3d at 347.

Here, although Juror Jeffers first testified she could not recall the victim-of-a-crime question on the jury questionnaire, she later testified she made "an honest mistake" when completing the questionnaire. She also testified she was "surprised" that she was not asked during voir dire whether she had been the victim of a crime and admitted she was the victim of domestic violence. In addition, even though Juror Jeffers "wondered"

- 21 -

if she would have been chosen if the attorneys knew about her past experiences with domestic violence, she failed to disclose this information twice during voir dire when given the opportunity. *See id.* ("[p]otential bias arises if a juror has been involved in a crime or incident similar to the one on trial.")

> [PROSECUTOR]: Can you think of anything that maybe we wouldn't know to ask you about that you think would trouble you about being a juror in this case? Anything that we have not asked you about?
>
> [JUROR JEFFERS]: I can't think of a thing.
>
> . . .
>
> [LEAD COUNSEL]: So you can't think of [anything] that hadn't been asked in the last few days, I'd say, between this questionnaire and between us questioning you, can you?
>
> [JUROR JEFFERS]: I can't.

Accordingly, a presumption of bias arises. The presumption of bias may be overcome by an absence of "actual prejudice." *Akins*, 867 S.W.2d at 357. Actual prejudice is established when the presumed bias is confirmed by the juror's conduct during jury deliberations giving rise to the possibility that improper extraneous information was provided to the jury. *Id.*

After failing to disclose her history of domestic violence during voir dire, Juror Jeffers told other jurors about her past experiences. While discussing the petitioner's wife, Juror Jeffers told other jurors she "knew what a[n] [abused] woman [would] do." She also told the jury "[y]ou can spot a woman that's been abused" because "[t]hey are different because of it."

Although the State attempted to elicit testimony from Juror Jeffers indicating she did not let her past experiences with domestic violence influence her verdict, this testimony was inadmissible under Tennessee Rule of Evidence 606(b), which states:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information

was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Here, during voir dire, Juror Jeffers testified generally that she could be fair and impartial. However, she did not disclose her relevant history of domestic abuse and misrepresented her history as a victim of domestic violence on the jury questionnaire. Her testimony at the post-conviction hearing that she did not let her past experiences with domestic violence influence her verdict was inadmissible. Because of her false representation on her questionnaire, neither the defense nor the trial court was able to question her regarding her prior experiences. During deliberations, Juror Jeffers discussed her experiences as the victim of domestic violence and compared herself to the petitioner's wife. Therefore, we conclude the State failed to rebut the presumption that Juror Jeffers was biased or prejudiced and could not serve as a fair and impartial juror, and the petitioner was denied the right to a jury that was fair and impartial.

The denial of the right to an impartial jury is a structural constitutional error that compromises the integrity of the judicial process and cannot be treated as harmless error. *State v. Odom*, 336 S.W.3d 541, 556 (Tenn. 2011); *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). Structural errors "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. United States*, 527 U.S. 1, 9 (1999). Because structural errors deprive a defendant of a right to a fair trial, they are subject to automatic reversal. *Rodriguez*, 254 S.W.3d at 361.

Accordingly, we reverse the post-conviction court's denial of post-conviction relief, vacate the petitioner's convictions, and remand the case to the trial court for a new trial. In light of the possibility of further appellate review, we will address the petitioner's remaining issues.

**B.     Juror Bunch**

The petitioner argues that Juror Bunch failed to disclose her relevant past history of domestic violence and that her presence on the jury violated his right to a fair and impartial jury. The State contends the petitioner failed to establish a prima facie case of bias. Upon our review of Juror Bunch's testimony and the applicable law, we conclude that the petitioner has failed to make a showing of actual prejudice and is, therefore, not entitled to relief.

- 23 -

At the post-conviction hearing, Juror Bunch could not recall her answer to the question on the jury questionnaire asking whether she had ever been the victim of a crime, but she reasoned she "would probably say no because [she] wouldn't consider what happened to [her] a crime." However, she also testified she had been the victim of domestic violence and was once in "a verbally abusive relationship." When describing the abuse, Juror Bunch testified "it could have gotten much worse, so yes, domestic violence does stay with me to some extent." Additionally, Juror Bunch was asked during individual voir dire if she had ever been the victim of a crime and answered "no."

While at first blush it appears Juror Bunch's answers and history might create a claim of juror bias, such is not the case when viewed more closely. As previously noted, a presumption of bias arises when a juror "willfully conceals . . . information . . . which reflects on the juror's lack of impartiality . . . ." *Akins*, 867 S.W.2d at 354. Juror Bunch made it clear that she did not equate being in a verbally abusive relationship to domestic violence or a crime. Thus, while she may have a history one might be concerned would reflect on Juror Bunch's ability to be impartial, she did not willfully withhold information or intentionally mislead the parties. Rather, Juror Bunch answered the question honestly because she did not believe she had been the victim of a crime.

In addition to the fact that Juror Bunch did not willfully withhold information, the record is void of any proof that she shared her experience with the other jurors or considered her personal history during deliberation. Therefore, even if we were to conclude Juror Bunch's history created a presumption of bias, the presumption may be rebutted by the absence of "actual prejudice," with the court viewing the totality of the circumstances, and not only "the juror's self[-]serving claim of lack of partiality." *Id.* Actual prejudice is established when the presumed bias is confirmed by the juror's conduct during jury deliberations giving rise to the possibility that improper extraneous information was provided to the jury. *Id.* Again, there is no proof in the record that Juror Bunch shared her history with the other jurors or that she considered it herself. As a matter of fact, Juror Bunch testified that the petitioner was found guilty based on the evidence presented at trial and not her past experiences.

Based on the foregoing, we conclude the petitioner has failed to establish juror bias and, therefore, cannot show he was denied his constitutional right to a fair and impartial trial based on Juror Bunch's presence on the jury. Thus, the petitioner is not entitled to relief.

## IV. Extraneous Prejudicial Information or Improper Outside Influence

The validity of a jury verdict will be considered questionable "[w]hen a jury has been subjected to either extraneous prejudicial information or an improper outside

- 24 -

influence." *Adams*, 405 S.W.3d at 650 (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Extraneous prejudicial information includes "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (internal citations omitted). Improper outside influence is "any unauthorized private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

The challenging party "must produce admissible evidence to make an initial showing that the jury was exposed to extraneous prejudicial information or subjected to an improper outside influence." *Id.* at 651 (citing *Caldararo*, 794 S.W.2d at 740-41). If successful, "a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless." *Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)). However, "something more than a bare showing of a mingling with the general public is required where the jury is not sequestered to shift the burden of proof to the State of showing no prejudice." *Blackwell*, 664 S.W.2d at 689. A violation of the constitutional right to an impartial jury presents a mixed question of law and fact which this Court reviews de novo, affording a presumption of correctness only to the trial court's findings of fact. *Adams*, 405 S.W.3d at 656 (citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001)).

### A.      Unidentified Juror

The petitioner argues an unidentified juror prejudiced the verdict by discussing the case with other jurors prior to deliberations. The State contends any statement about the petitioner's guilt by the unidentified juror constituted premature jury deliberation.

At the evidentiary hearing, Juror Jeffers testified that, prior to the end of the petitioner's trial, a male juror stated he knew the petitioner was guilty. However, Juror Jeffers "didn't pay any attention to him," and she was unable to identify which juror made the statement.

This Court has previously held post-verdict inquiries into premature deliberations by the jury are barred because such deliberations do not involve extraneous prejudicial information or outside influence. *See State v. Tavarus Detterio Griffin*, No. W2014-02114-CCA-R3-CD, 2015 WL 7833205 at *11 (Tenn. Crim. App. Dec. 3, 2015) (holding a juror's statement that he "knew the defendant was guilty" was analogous to a claim that the juror prematurely deliberated), *perm. app. denied* (Tenn. Mar. 23, 2016); *State v. Frazier*, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984). The petitioner is not entitled to relief on this issue.

## B. Juror Davis

The petitioner argues Juror Davis was accosted in the hallway of the courthouse during the trial and threatened by an unidentified man. The State failed to respond to this claim in its brief.

At the post-conviction hearing, Juror Davis testified he was approached by an unidentified man as the jury was leaving the courthouse during the trial. The man walked up to Juror Davis and stated, "I know where you live." At the time, Juror Davis believed the man was a member of the petitioner's family and reported the incident to Sheriff Jim Carson. That evening, the jury was relocated to a new hotel.

When a juror has been exposed to outside influences, a rebuttable presumption of prejudice arises. *Adams*, 405 S.W.3d at 651. Because the petitioner has made the requisite initial showing that Juror Davis was subjected to an improper outside influence by an unknown person, the burden now shifts to the State to either explain the conduct or prove the exposure was harmless. *Id.*

During cross-examination, Juror Davis testified he did not believe the relocation was a result of the threat. He further testified the threat did not influence his deliberations. However, as discussed above, testimony of the effect of the threat on Juror Davis's deliberations was inadmissible under Tennessee Rule of Evidence 606(b), and the trial court erred in allowing the State to elicit this testimony over the petitioner's objection. Beyond the inadmissible testimony of Juror Davis's thoughts during deliberations, the State offered no further proof regarding the threat against Juror Davis. Therefore, we conclude the State failed to explain the communication or to show the communication was harmless to rebut the presumption, and the petitioner is entitled to relief.

## C. Extraneous Information from Bailiff

The petitioner argues Bailiff Phyllis Griffith told Jurors Jeffers and Bunch information regarding the threat to Juror Davis. The State contends any exposure to improper outside influence by Bailiff Griffith was harmless.

At the post-conviction hearing, Juror Jeffers testified Bailiff Griffith told her the jury was being relocated for security reasons because "one of the jurors had been threatened" and because the jury needed to be at a more secure hotel. Juror Bunch testified she was given several different reasons for the jury's relocation, including "threats" and "security reasons." She recalled Bailiff Griffith telling her the jury was being moved because lead counsel was staying in the same hotel. Bailiff Ronnie Gunter

testified he believed the jury was relocated because one of the jurors was uncomfortable at the original hotel, although he could not recall the exact reason. He also did not recall being informed of a threat to Juror Davis during the trial. Bailiff Griffith was not called to testify about these events.

Based on the foregoing testimony, we conclude an improper communication was made to Juror Jeffers by Bailiff Griffith when she told Juror Jeffers about the threat to Juror Davis. Because the petitioner has made the requisite initial showing that Juror Jeffers was subjected to an improper outside influence by Bailiff Griffith, the burden now shifts to the State to either explain the conduct or prove the exposure was harmless. *Adams*, 405 S.W.3d at 651.

The State, however, has provided no evidence to rebut this presumption. The State could have called Bailiff Griffith to testify as to whether she actually made the statement, or the other jurors who testified at the post-conviction hearing were not asked whether they heard Bailiff Griffith make the statement to Juror Jeffers. Although Juror Bunch testified as to what Bailiff Griffith told her about the relocation, she was not asked if she heard Bailiff Griffith's conversation with Juror Jeffers. Because no other proof was presented by the State at the post-conviction hearing on this issue, we conclude the State failed to sufficiently explain the communication or show the communication was harmless to the petitioner, and the petitioner is entitled to relief.

## V. Ineffective Assistance of Counsel

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields*, 40 S.W.3d at 458. Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the

standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A.    Trial Counsel

### i.    Failure to Investigate Probate Issue

The petitioner argues trial counsel was ineffective for failing to investigate a potential probate issue involving the victims and their family. The petitioner contends trial counsel failed to adequately research the issue prior to trial. The State contends the petitioner failed to prove trial counsel was deficient.

At the post-conviction hearing, lead counsel was unable to recall the probate issue. Co-counsel also had trouble recalling the specifics of the probate issue. However, he believed he investigated it prior to trial. The post-conviction court found trial counsel "gave adequate responses to their preparation, their planning." Implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, the petitioner has failed to provide any evidence demonstrating how he was prejudiced by trial counsel's failure to investigate the probate issue. Accordingly, the petitioner is not entitled to relief on this issue.

### ii. Failure to Investigate Evidence from Crime Scene

The petitioner argues trial counsel was ineffective for failing to investigate cigarette butts and light fixtures collected from the crime scene. Specifically, the petitioner contends trial counsel should have tested the items for fingerprints and DNA. The State contends the petitioner failed to meet his burden.

At the post-conviction hearing, co-counsel initially testified there was no strategic reason for not testing the evidence. However, co-counsel later testified that if the evidence tested positive for the petitioner's fingerprints or DNA, they would be forced to disclose that information to the State which "would have ended this case." Lead counsel was unable to recall the cigarette butts and light fixtures collected from the crime scene. As discussed above, the post-conviction court accredited trial counsel's testimony, and nothing in the record preponderates against its factual findings. *See Tidwell*, 922 S.W.2d at 500. Furthermore, the petitioner failed to present the results of any such testing and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990). The petitioner is not entitled to relief on this issue.

### iii. Failure to Properly Question Juror N. S. during Voir Dire

The petitioner argues trial counsel was ineffective for failing to properly question Juror N. S. during voir dire. Specifically, the petitioner contends trial counsel failed to question Juror N. S. about her disclosure on the jury questionnaire that she and her sister were raped by their stepfather and that she was the victim of domestic violence. The State contends the petitioner failed to establish prejudice.

At the post-conviction hearing, Juror N. S. testified she answered on her questionnaire that she had been the victim of a crime. More specifically, she stated that she and her sister were raped by their stepfather, and she had also been the victim of domestic violence. However, during her individual voir dire, Juror N. S. was not questioned about this response. Co-counsel testified he did not recall Juror N. S.'s

responses on the jury questionnaire. He stated they may not have asked her about being the victim of child rape if "there were other things in her questionnaire that made us think that we didn't need to ask her that question," but he was unable to specify what those "other things" may have been. On cross-examination, co-counsel agreed Juror N. S. may have been chosen because she knew co-counsel's mother. Lead counsel testified there was no explanation why Juror N. S. was not excused after disclosing she was raped by her stepfather. However, on cross-examination, lead counsel acknowledged Juror N. S.'s disclosure would be a "factor" to consider instead of the "whole picture."

While there is no requirement trial counsel ask specific questions during voir dire, this Court has recognized that potential bias arises if a juror has been involved in a crime or incident similar to the one on trial. *See Ricketts v. Carter*, 918 S.W.2d 419, 422 (Ten. 1996); *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945). Therefore, "absent a showing that counsel had a strategic reason for not asking the question, the failure to ask the prospective jurors about their past experiences as victims or associates of victims is objectively unreasonable." *Smith*, 357 S.W.3d at 347.

There is nothing in the record demonstrating trial counsel had a strategic reason not to question Juror N. S. about her disclosure. Therefore, we conclude trial counsel's failure to question Juror N. S. about her experiences as a victim of a crime was objectively unreasonable and resulted in deficient performance. *Id.* Additionally, because juror bias has already been established, we conclude the petitioner has demonstrated the requisite prejudice. Because he has proven both deficient performance and prejudice, the petitioner has established he was denied his constitutional right to the effective assistance of counsel. Accordingly, the petitioner is entitled to a new trial.

### iv.    Failure to Properly Question Prospective Jurors Regarding Pretrial Publicity

The petitioner argues trial counsel was ineffective for failing to properly inquire into prospective jurors' exposure to pretrial publicity. The petitioner contends nine of the twelve jurors disclosed they had been exposed to pretrial publicity. However, only one of these jurors was asked the extent of the exposure. The State contends the petitioner failed to establish prejudice.

At the post-conviction hearing, Juror Jeffers testified she was not asked during voir dire the extent of her exposure to pretrial publicity, and a review of the record shows, although nine of the jurors who sat on the petitioner's jury indicated they had been exposed to pretrial publicity, only one juror was asked specifically what he had read about the case. Co-counsel testified he was unsure why only one juror was asked to elaborate as to what pretrial publicity he had been exposed. However, he reasoned if the juror indicated the media coverage would not have an impact on their judgment, it was

not necessary to ask each prospective juror about media exposure and/or pretrial publicity. Lead counsel agreed prospective jurors should have been asked about the extent of their pretrial publicity exposure.

This Court has held "[a] prospective juror's mere exposure to pretrial publicity is not constitutional error." *State v. Gray*, 960 S.W.2d 598, 608 (Tenn. Crim. App. 1997). Prospective jurors who have been exposed to pretrial publicity may sit on a panel if they can demonstrate to the trial court that they can disregard what they have heard and decide the case on the evidence presented at trial. *Id.* Similarly, prejudice will not be presumed merely by a showing of extensive pretrial publicity. *State v. Stapleton*, 638 S.W.2d 850, 856 (Tenn. Crim. App. 1982).

Here, the petitioner has failed to provide any proof he was prejudiced by the jurors' exposure to pretrial publicity or by trial counsel's failure to question prospective jurors about their exposure. Additionally, on direct appeal, our supreme court found that "[w]hile several of the jurors acknowledged that they had some exposure to information appearing in the local newspaper, all promised to serve in an impartial manner and to heed the instructions of the trial court." *Sexton*, 368 S.W.3d at 396. The petitioner is not entitled to relief on this issue.

### v. Failure to Preserve Appellate Record

The petitioner argues trial counsel was ineffective for failing to include the peremptory challenges in the appellate record. Specifically, the petitioner contends the absence of the peremptory challenges deprived him of a full and fair review of his jury claim on direct appeal. The State contends the petitioner has failed to meet his burden.

The petitioner asserts he was deprived of a full review of his jury claim on direct appeal due to the fact the peremptory challenges were not part of the appellate record. However, a review of the record shows, although the supreme court noted the petitioner failed to prove he exhausted all of his peremptory challenges, the court ultimately denied relief on the petitioner's jury claim based on the merits of the claim. Because the supreme court reviewed the petitioner's claim on the merits, the petitioner cannot prove he was prejudiced by trial counsel's failure to include the peremptory challenges in the appellate record. The petitioner is not entitled to relief on this issue.

### vi. Failure to Challenge Search of the Petitioner's Vehicle

The petitioner argues trial counsel was ineffective for failing to file a motion to suppress the Dollar Store receipt found in the petitioner's vehicle. The petitioner contends the search of his vehicle was conducted without a search warrant or consent,

and the receipt was, therefore, inadmissible. The State contends the petitioner has failed to prove trial counsel was deficient for failing to file a motion to suppress.

At the post-conviction hearing, co-counsel testified "it could be argued" the search of the petitioner's vehicle was illegal if neither the petitioner nor his ex-wife consented, and he did not know why the search was not addressed at trial. However, on cross-examination, co-counsel testified either the petitioner or his ex-wife would have been required to testify at a suppression hearing to establish a lack of consent, and co-counsel agreed the petitioner was "not enthusiastic" about testifying. Lead counsel testified he could not recall the petitioner's informing him that the vehicle search was performed without consent, and he agreed trial counsel should have challenged the search as a violation of the Fourth Amendment. On cross-examination, lead counsel agreed it would be impossible to exclude the receipt if neither the petitioner nor his ex-wife were willing to testify at the suppression hearing. Ms. Farmer, the petitioner's ex-wife, testified she could not recall whether she gave officers permission to search the home, and she was not asked whether she consented to a search of the vehicle.

To prove prejudice on a claim that trial counsel was ineffective for failing to file a motion to suppress, a petitioner must show "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436 at *8 (Tenn. Crim. App. Sept. 12, 2011), *no perm. app. filed* (citing *Vaughn v. State*, 202 S.W.3d 103, 120 (Tenn. 2006)). Therefore, "[i]f a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present . . . the [evidence supporting the claim] at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong." *Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415 at *4 (Tenn. Crim. App. Nov. 8, 2013), *perm. app. denied* (Tenn. Mar. 17, 2014).

Here, the petitioner provided no proof to support his assertion that a motion to suppress the Dollar Store receipt would have been granted. The trial transcript, submitted as evidence at the post-conviction hearing, shows the petitioner's vehicle was searched following consent from the petitioner. Ms. Farmer testified she could not recall whether she gave consent to search the home, and the petitioner failed to ask her whether she consented to a search of the vehicle. Furthermore, the petitioner did not testify at the hearing. Accordingly, the petitioner cannot establish prejudice and, therefore, is not entitled to relief on this issue.

**vii.     Failure to Prepare for 404(b) Hearing**

The petitioner argues trial counsel was ineffective for failing to investigate and prepare for a 404(b) hearing concerning the admission of the child sex abuse allegations against the petitioner. Specifically, the petitioner contends trial counsel failed to interview the alleged victim, prepare a response to the State's brief, cross-examine Hope Tharp, the DCS worker who testified regarding the sexual abuse allegations against the petitioner, and introduce medical reports and inconsistent statements. The State contends the petitioner failed to establish prejudice.

At the post-conviction hearing, co-counsel testified he and lead counsel worked together to prepare for the 404(b) hearing. However, co-counsel did not recall interviewing any witnesses in preparation for the hearing. Instead, their strategy was to argue the evidence was "grossly prejudicial" and, therefore, inadmissible. Lead counsel was unable to recall the 404(b) hearing or the child sex abuse allegations against the petitioner.

Our review of the record shows trial counsel argued vigorously during the hearing that the allegations were extremely prejudicial and suggested the State instead establish motive by referencing the child custody issues existing between the petitioner and the victims. Additionally, trial counsel repeatedly requested a full 404(b) hearing. However, the trial court denied trial counsel's request and issued a ruling, based solely on the State's brief and the arguments of counsel, holding the testimony of Ms. Tharp was admissible to establish motive. On direct appeal, the Tennessee Supreme Court held the probative value of Ms. Tharp's testimony was not essential to the State's case due to its cumulative nature, and therefore, the prejudicial effect of the allegations outweighed their probative value.

As noted above, co-counsel's testimony indicates they prepared for the 404(b) hearing, and they decided to argue the prejudicial effect of the allegations outweighed any probative value. The post-conviction court accredited the testimony of trial counsel, and nothing in the record preponderates against the findings of the post-conviction court. *See Tidwell*, 922 S.W.2d at 500. In addition, the fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

Furthermore, although the petitioner argues trial counsel should have interviewed witnesses or introduced evidence, such as medical records or inconsistent statements, the petitioner failed to present the witnesses or evidence at the post-conviction hearing and, therefore, cannot establish prejudice. *See Black*, 794 S.W.2d at 757-58. The petitioner is not entitled to relief on this issue.

### viii. Failure to Cross-Examine Preston Adams

The petitioner argues trial counsel was ineffective for failing to properly cross-examine Preston Adams, who testified at trial that the petitioner confessed to the murders. The petitioner contends lead counsel stopped in the middle of his cross-examination and asked the trial court for permission to recall Mr. Adams at a later time. However, lead counsel failed to recall Mr. Adams.

The petitioner failed to cite to any authority for this claim, and, therefore, it is waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Additionally, the petitioner offered no proof as to how he was prejudiced by lead counsel's decision not to recall Mr. Adams. Thus, the petitioner is not entitled to relief on the merits of his claim.

### ix. Failure to Object to Testimony Concerning Ballistics

The petitioner argues trial counsel was ineffective for failing to object to the pathologist's testimony concerning ballistics. Specifically, the petitioner contends Dr. Elkins' testimony that the fragments recovered from the victims were consistent with a .22 caliber bullet was outside the scope of her expertise. The State contends the petitioner failed to prove trial counsel was ineffective.

At the post-conviction hearing, co-counsel agreed Dr. Elkins was not qualified as a ballistics expertise at trial. However, co-counsel did not think Dr. Elkins' testimony stating the fragments "were consistent with a .22 bullet" warranted an objection because he believed she was "probably qualified to testify" to her opinions on that topic. On cross-examination, co-counsel further explained the testimony was "within [Dr. Elkins'] area of expertise based on what [co-counsel] knew and understood it to be." Lead counsel agreed Dr. Elkins was not qualified as an expert in ballistics and did not know why he did not object to her testimony.

Although lead counsel could not recall why he did not object to Dr. Elkins' testimony regarding the bullet fragments, co-counsel testified the decision not to object to Dr. Elkins' testimony was based on the belief that her testimony was within the scope of her expertise. Though the petitioner claims Dr. Elkins testified outside of her area of expertise, he failed to present any proof in support of his claim. Absent proof Dr. Elkins could not have been qualified as a ballistics expert, the petitioner, while he might be able to establish counsel was deficient for not challenging Dr. Elkins' testimony, cannot show Dr. Elkins would not have qualified as a ballistics exper or how he was prejudiced by

- 34 -

counsel's actions. Thus, the petitioner failed to establish both prongs of the *Strickland* standard and is not entitled to relief on this issue.

**x.      Failure to Inquire into the Jury's Relocation**

The petitioner argues trial counsel was ineffective for failing to inquire as to why the jury was moved to a different hotel. Specifically, the petitioner contends trial counsel would have discovered the threat to Juror Davis and could have requested a mistrial. The State contends the petitioner failed to prove trial counsel was deficient.

Our review of the record shows lead counsel approached the trial court at the start of the second day of trial and requested the court place information of the jury's relocation the night before on the record. The trial court stated it "received communications from the jury attendants that [the jury was] somewhat concerned with the logistics" of their living situation, specifically that lead counsel was staying at the same hotel. Because the jury was uncomfortable, they were relocated to a different hotel. The trial court emphasized there were "[n]o communications," and "[n]obody ever attempted to talk to anyone." Although the trial court told trial counsel they could "make inquiry," trial counsel declined.

At the post-conviction hearing, co-counsel testified the jury was relocated because they were staying at the same hotel as lead counsel. He did not believe the jury should have been questioned by trial counsel because they had already given "satisfactory answers" to the trial court. Although he was not aware of any threats to the jury, co-counsel would have "explored" the issue if it came up. Lead counsel testified he believed the jury was uncomfortable because he and the jury were staying at the same hotel. He was not aware of any threats to jurors and testified he would have brought a jury threat to the trial court's attention if he were made aware of it.

The petitioner has failed to prove trial counsel was deficient for failing to make further inquiry into the jury's relocation. Co-counsel did not ask to question the jury because he felt the trial court had already been given "satisfactory answers." Both co-counsel and lead counsel believed the jury was moved because they were uncomfortable staying at the same hotel as lead counsel and would have inquired further if they suspected a juror had been threatened. As noted, the trial court informed the parties that the jury was being moved because they were uncomfortable staying in the same hotel as trial counsel. The trial court also informed the parties there was no communication with the jury and no one had attempted to talk to the jury. Based on the information provided by the trial court to the parties, trial counsel had no reason to question the veracity of the information, and the petitioner has failed to show that the professional norms would

- 35 -

require such of trial counsel  Thus, the petitioner failed to establish deficient performance and is not entitled to relief.

### xi.     Failure to Advise the Petitioner Concerning Stipulation

The petitioner argues trial counsel was ineffective for failing to correctly advise him concerning the stipulation of Ms. Chumley.  The petitioner contends trial counsel redacted the wrong sentence in the stipulation prior to its admittance and failed to realize the mistake when the stipulation was read to the jury.

The petitioner failed to cite to any authority for this claim, and, therefore, it is waived.  Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").
Despite his waiver of this claim, the petitioner is not entitled to relief on the merits for several reasons.  Initially, the petitioner failed to present proof that the stipulation entered at trial was improperly redacted.  Thus, the petitioner failed to prove his factual allegation by clear and convincing evidence.  Additionally, lead counsel testified he made a strategic decision to stipulate to the Dollar Store receipt.  By stipulating to the introduction of the receipt, lead counsel avoided having the petitioner identified in open court and in front of the jury by the store employee.  The fact that a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel.  *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).  Deference is given to sound tactical decisions made after adequate preparation for the case.  *Id.*  The petitioner is not entitled to relief on this issue.

### xii.    Abandoning the Petitioner During Trial

The petitioner argues trial counsel was ineffective for abandoning the petitioner during trial.  Specifically, the petitioner contends lead counsel left the courtroom during the direct examination of Agent Guy and returned during the direct examination of the following witness, Agent Brakebill.  During his cross-examination of Agent Brakebill, lead counsel mistakenly referred to Agent Brakebill as Agent Guy.

However, the petitioner failed to cite to any authority for this claim, and, therefore, it is waived.  Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

In addition to waiver, the petitioner also failed to present any proof as to how he was prejudiced by lead counsel's leaving the courtroom. The record makes clear that the petitioner was represented at trial by two attorneys. Therefore, while lead counsel may have left the courtroom momentarily during trial, the petitioner was not left without representation. Accordingly, the petitioner has failed to establish prejudice and is not entitled to relief.

## B. Appellate Counsel

### i. Failure to Preserve Appellate Record

The petitioner argues appellate counsel was ineffective for failing to include the peremptory challenges in the appellate record. Specifically, the petitioner contends failing to include the peremptory challenges deprived him of a full and fair review of his jury claim on direct appeal. The State contends the petitioner has failed to meet his burden.

Although the petitioner asserts he was deprived of a full review of his jury claim on direct appeal due to the lack of peremptory challenges in the appellate record, as discussed above, our supreme court reviewed the petitioner's jury claim on appeal and denied relief based on the merits of the claim. Because the court reviewed the petitioner's claim on the merits, the petitioner cannot prove he was prejudiced by appellate counsel's failure to include the peremptory challenges in the appellate record and, therefore, is not entitled to relief on this issue.

### ii. Failure to Raise Issues

The petitioner asserts appellate counsel was ineffective for failing to raise two issues on direct appeal. Specifically, the petitioner contends appellate counsel should have raised the issues of the threat to Juror Davis and Bailiff Griffith's providing extraneous information to the jury.

However, the petitioner failed to cite to any authority for this claim, and, therefore, it is waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). In addition to waiver, the petitioner failed to offer any proof that appellate counsel was or should have been aware of the threat to Juror Davis or that Bailiff Griffith shared extraneous information with the jury. Thus, the petitioner failed to establish that appellate counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The petitioner is, therefore, not entitled to relief.

**C.      Appellate and Re-sentencing Counsel**

**i.      Failure to Object to State's Inappropriate Argument**

The petitioner contends appellate and re-sentencing counsel were ineffective for failing to object to the prosecutor's inappropriate argument during the re-sentencing hearing. The petitioner argues the prosecutor made several references to child sex abuse allegations against the petitioner and called him a "child rapist." However, the Tennessee Supreme Court had previously held the child rape allegations were inadmissible.

The petitioner failed to cite to any authority for this claim, and, therefore, it is waived. Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10 ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

**VI.      Prosecutorial Overreaching**

The petitioner argues the prosecution deliberately and maliciously fabricated the child rape allegations against the petitioner. The State contends the petitioner waived this claim during the post-conviction hearing. We agree. At the conclusion of the post-conviction hearing, the petitioner announced he was withdrawing his claim of prosecutorial overreaching "in its entirety." The petitioner is not entitled to relief on this issue.

**VII.      Prosecutorial Misconduct**

The petitioner argues the State committed prosecutorial misconduct by engaging in a cover-up of the threat to Juror Davis. The petitioner contends it would be "ludicrous" to believe the State was not aware of the threat to Juror Davis.

However, the petitioner failed to provide any proof the State was aware of the threat to Juror Davis or that a cover-up existed to hide the threat from the defense. Furthermore, the record before us contains no proof of a cover-up. The petitioner is not entitled to relief on this issue.

**VIII.      Trial Court Error**

The petitioner argues the trial court erred by violating Tenn. R. Crim. P. 24(d)(5). Specifically, the petitioner contends the trial court failed to utilize a method of recording peremptory challenges that would have ensured the challenges were part of the technical

record. The State contends the petitioner waived this claim during the post-conviction hearing. We agree. At the conclusion of the post-conviction hearing, the petitioner announced he was withdrawing his claim of trial court error, "with the exception of the juror questionnaires." The petitioner is not entitled to relief on this issue.

## IX.    Cumulative Error

The petitioner asserts the cumulative effect of the errors rendered the guilt and penalty phases of his trial fundamentally unfair. We have rejected the petitioner's *Brady* claim, claim of trial court error, and prosecutorial misconduct and overreaching claims. We have also rejected all but one of the petitioner's ineffective assistance of counsel claims. We, however, conclude the petitioner received ineffective assistance of counsel when trial counsel failed to voir dire N. S. regarding her history of sexual abuse, and the petitioner was denied his right to a fair and impartial jury, requiring automatic reversal.

### *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is reversed, the petitioner's convictions are vacated, and the matter is remanded to the trial court for a new trial.

_____
J. ROSS DYER, JUDGE